**In the Matter of the WELFARE OF M.L.M.**

**No. A09–0875.**

Supreme Court of Minnesota.

Jan. 25, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

William M. Ward, Chief Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, MN, for appellant M.L.M.

OPINION

DIETZEN, Justice.

This case presents the question of whether Minn.Stat. § 609.117, subd. 1(2) (2010), violates the prohibition against unreasonable searches and seizures, or the Equal Protection Clause in either the U.S. or Minnesota Constitutions. Subdivision 1(2) requires a juvenile petitioned for a felony and then adjudicated delinquent of a misdemeanor arising out of the same set of circumstances "to provide a biological specimen" to determine the person's DNA profile for the limited purpose of criminal identification. Applying the totality-of-the-circumstances test, we conclude that the State's legitimate governmental interests in conducting a search of M.L.M. to collect a biological specimen for criminal identification purposes outweigh appellant's reduced expectation of privacy following her misdemeanor adjudication arising out of the same set of circumstances as her felony petition. Consequently, as applied to M.L.M., Minn.Stat. § 609.117, subd. 1(2), does not violate the prohibitions against unreasonable searches and seizures in the U.S. and Minnesota Constitutions. We also conclude that M.L.M.'s equal protection claim fails. Accordingly, we affirm.

In December 2008, the State filed a delinquency petition alleging that appellant M.L.M. committed felony possession of burglary tools in violation of Minn.Stat. § 609.59 (2010); gross misdemeanor theft over $500 in violation of Minn.Stat. § 609.52, subds. 2(1), 3(4) (2010); gross misdemeanor damage to property in violation of Minn.Stat. § 609.595, subd. 2(a) (2010); and misdemeanor fleeing a peace officer in violation of Minn.Stat. § 609.487, subd. 6 (2010), after she and another juvenile allegedly used scissors to remove se-

curity sensors from unpurchased merchandise and then removed the merchandise from a mall in Edina.

Before trial, the State offered to dismiss the felony possession of burglary tools charge and two of the misdemeanor charges, in exchange for M.L.M.'s plea to the charge of gross misdemeanor theft over $500. M.L.M. agreed, and the court adjudicated her delinquent on the gross misdemeanor theft charge. M.L.M. was also adjudicated a petty offender based on a petition for underage consumption in an unrelated incident. The court ordered her to complete six days of sentence-to-service and placed her on probation. As part of her probation conditions, M.L.M. was required to submit to random urinalyses and continue therapy. The State asserted "DNA would be required" but recognized an appeal was pending on a case involving the constitutionality of a similar application of section 609.117.[1] The court ordered the DNA collection, but stayed the matter for one month to allow the parties to brief the issue of the constitutionality of section 609.117, subdivision 1(2).

M.L.M. argued that the portion of section 609.117, subdivision 1(2), that requires a juvenile adjudicated delinquent of a misdemeanor to submit a DNA sample violated the prohibitions against unreasonable searches and seizures and was a denial of equal protection of the laws in violation of the U.S. and Minnesota Constitutions. The district court rejected M.L.M.'s arguments and concluded the statute is constitutional. In a published opinion, the court of appeals affirmed the district court's conclusion that section 609.117, subdivision 1(2), is constitutional as applied to a juvenile petitioned for a felony offense and

then adjudicated delinquent of a misdemeanor arising out of the same set of circumstances. *In re the Welfare of M.L.M.*, 781 N.W.2d 381, 390 (Minn.App. 2010). The court also concluded that M.L.M. failed to demonstrate that section 609.117, subdivision 1(2), violated her right to equal protection of the laws. *Id.* Subsequently, M.L.M. filed a petition for review, which we granted.

I.

M.L.M. argues that Minn.Stat. § 609.117, subd. 1(2), is unconstitutional because it requires a juvenile adjudicated delinquent of a misdemeanor to provide a DNA sample in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution. The State argues that a juvenile petitioned for a felony and then adjudicated delinquent of a misdemeanor arising out of the same set of circumstances has a reduced expectation of privacy and that the State's interest in DNA collection outweighs that reduced expectation of privacy; therefore, collecting a DNA sample from that juvenile is not an unreasonable search or seizure.

■■■ The constitutionality of a statute presents a question of law, which we review de novo. *State v. Melde*, 725 N.W.2d 99, 102 (Minn.2006). We presume Minnesota statutes are constitutional and will strike down a statute as unconstitutional only if absolutely necessary. *See State v. Behl*, 564 N.W.2d 560, 566 (Minn.1997). The party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute violates a constitutional provision. *State v. Bartylla*, 755 N.W.2d 8, 14 (Minn.2008).

---

1. The pending appeal was *State v. Johnson*, 777 N.W.2d 767 (Minn.App.2010). We granted review of *Johnson* and heard consolidated oral argument on both *Johnson* and the pres-

ent case. The decision in *Johnson* was considered and is released contemporaneously with this decision. *State v. Johnson*, 813 N.W.2d 1 (Minn.2012).

To answer the question presented, we must examine the statutes that authorize the collection of a biological specimen and the provisions of the U.S. and Minnesota Constitutions that prohibit unreasonable searches and seizures, and then apply the constitutional protections to the statutes at issue in this case.

Section 609.117, subdivision 1, provides that a

> court shall order an offender to provide a biological specimen for the purpose of DNA analysis as defined in section 299C.155 when: ... (2) the juvenile court adjudicates a person a delinquent child who is petitioned for committing or attempting to commit a felony offense and is adjudicated delinquent for that offense or any offense arising out of the same set of circumstances.

It is undisputed that M.L.M., who was petitioned for felony possession of burglary tools and then adjudicated delinquent of gross misdemeanor theft over $500 "arising out of the same set of circumstances," was adjudicated delinquent of a crime that satisfies the requirements of section 609.117, subdivision 1(2).

Section 609.117, subdivision 1, incorporates the definition of "DNA analysis" in section 299C.155, subdivision 1. DNA analysis means "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another human biological specimen for identification pur-poses." Minn.Stat. § 299C.155, subd. 1 (2010). Thus, the term "DNA analysis" is expressly limited to the collection and analysis of a biological sample for identification purposes. *Id.; accord* Minn.Stat. § 299C.09 (2010). Section 609.117, subdivision 1, does not authorize the collection of a biological sample for any other purpose.[2]

The DNA collection authorized by section 609.117, subdivision 1, is conducted using uniform procedures and protocols. Minn.Stat. § 299C.155 (2010). A biological specimen may be collected using a buccal swab, which involves "gently swab[bing] the inside of the cheek [with a sterile cotton swab]." Minnesota Department of Public Safety, *Guide to DNA Analysis* 1 (2003). The DNA profile (which does not contain the person's full DNA sequence) is placed in a database that is linked to the National DNA Offender Database (CODIS). *Id.* at 3; National Institute of Justice, *The Future of Forensic DNA Testing* 19–20 (2000). To ensure privacy, personal identifiers such as social security number and case-related information are not stored in the CODIS database. National Institute of Justice, *supra*, at 20. The DNA profiles stored in the database may be accessed by authorized law enforcement personnel solely for law enforcement identification purposes. Minn.Stat. § 299C.155, subd. 3; *see also* 42 U.S.C. § 14132(b)(3)(a) (2006).

---

2. The dissent argues that the State has failed to establish that the collection of a biological specimen to obtain highly personal genetic information is a reasonable search. But that is not the issue before the court. Rather, the question is whether the collection of a biological specimen to develop a DNA profile for criminal identification purposes is a reasonable search. Section 609.117, subdivision 1, does not allow the State to extract highly personal genetic information from the biologi-cal specimen taken; instead, the statute only allows the State to use the biological specimen to produce a DNA profile for criminal identification purposes, employing human genome locations that contain no genetic information. Moreover, there is no evidence that the State has or intends to use the biological specimens to extract highly personal genetic information. Thus, the dissent's argument is without merit.

The precise question we must decide is whether the collection of biological specimens for identification purposes authorized by section 609.117, subdivision 1(2), is an unreasonable search and seizure in violation of the U.S. and Minnesota Constitutions. The Fourth Amendment to the U.S. Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The language of Article I, Section 10, of the Minnesota Constitution is identical. "The touchstone of the Fourth Amendment is reasonableness...." *United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Generally, the reasonableness of a search depends upon whether the government has complied with the Warrant Clause by obtaining a warrant from a neutral magistrate based upon probable cause. *United States v. U.S. District Court*, 407 U.S. 297, 315–16, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Applying a totality-of-the-circumstances test that balances the State's interests against the intrusion into an individual's privacy, the U.S. Supreme Court has carved out a number of exceptions to the Warrant Clause. *Knights*, 534 U.S. at 118–19, 121–22, 122 S.Ct. 587.

Recently, the Supreme Court applied the totality-of-the-circumstances test to cases involving warrantless searches of probationers and parolees convicted of a felony. *Samson v. California*, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *Knights*, 534 U.S. at 118–19, 122 S.Ct. 587. In *United States v. Knights*, the Court considered whether a warrantless search of a probationer's apartment supported by reasonable suspicion and authorized by a condition of his probation was reasonable "under [the Court's] general Fourth Amendment approach of examining the totality of the circumstances."

534 U.S. at 118, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted). The Court concluded that the "reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118–19, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted). The Court reasoned that "probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id.* at 119, 122 S.Ct. 587 (internal quotation marks omitted) (citation omitted).

Similarly, in *Samson v. California*, the Court applied the totality-of-the-circumstances test to a suspicionless search of a parolee conducted pursuant to a California law, which provided that, as a condition for release, every prisoner eligible for state parole must agree to be subject to a search or seizure by a parole officer or other peace officer with or without a search warrant and with or without cause. 547 U.S. at 846, 848, 126 S.Ct. 2193. In doing so, the Court assessed " 'the degree to which [the search] intrude[d] upon an individual's privacy' " against " 'the degree to which [the search was] needed for the promotion of legitimate governmental interests.' " *Id.* at 848, 126 S.Ct. 2193 (quoting *Knights*, 534 U.S. at 118–19, 122 S.Ct. 587). In evaluating the degree of intrusion, the Court reaffirmed its holding in *Knights* that "by virtue of their status alone, probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id.* at 848–49, 126 S.Ct. 2193 (citing *Knights*, 534 U.S.

at 119, 122 S.Ct. 587) (internal quotation marks omitted).

A majority of federal circuits have applied the *Knights–Samson* totality-of-the-circumstances test to address the reasonableness of warrantless, suspicionless searches under the Federal DNA Act, 42 U.S.C. § 14135a (2006). Currently, eight circuits have concluded these searches are not unreasonable and therefore do not violate the Fourth Amendment.[3]

In *State v. Bartylla,* we considered whether the collection of a convicted felon's DNA, as authorized by Minn.Stat. § 609.117 (2002), violated the prohibitions of the U.S. and Minnesota Constitutions against warrantless, suspicionless searches. 755 N.W.2d 8, 14, 18 (Minn. 2008). Bartylla was convicted of murder in the first degree for a homicide that had grown cold until a DNA sample collected from Bartylla three years later matched DNA collected during the murder investigation. *Id.* at 12. Applying the *Knights–Samson* totality-of-the-circumstances test, we concluded that "as a result of his felony burglary conviction, the warrantless, suspi-

cionless taking of Bartylla's DNA pursuant to Minn.Stat. § 609.117 for purposes of placing his DNA profile into the state-mandated database did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures." *Id.* at 17.

■ We reasoned that as an incarcerated felon, Bartylla had a lower expectation of privacy than a probationer, parolee, or conditional releasee, and the physical intrusion was "minimal." *Id.* at 17–18. On the other hand, the State's interests of "exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes" were substantial. *Id.* at 18. For the same reasons, we concluded the DNA collection authorized by section 609.117 did not violate Article I, Section 10 of the Minnesota Constitution.[4] *Id.* at 19. In doing so, we reasoned that the "totality-of-the-circumstances test we adopt today" provided adequate protections to Minnesota's citizens, and therefore we declined to interpret Article I, Section

---

3. *See United States v. Weikert,* 504 F.3d 1, 11, 15 (1st Cir.2007) (applying the totality-of-the-circumstances test to analyze and uphold the Federal DNA Act); *United States v. Sczubelek,* 402 F.3d 175, 184 (3d Cir.2005) (same); *Groceman v. U.S. Dep't of Justice,* 354 F.3d 411, 413–14 (5th Cir.2004) (same); *United States v. Conley,* 453 F.3d 674, 679–81 (6th Cir.2006) (same); *United States v. Kraklio,* 451 F.3d 922, 924–25 (8th Cir.2006) (same); *United States v. Kincade,* 379 F.3d 813, 832, 839 (9th Cir.2004) (plurality opinion) (same); *Banks v. United States,* 490 F.3d 1178, 1193 (10th Cir.2007) (same); *Johnson v. Quander,* 440 F.3d 489, 496 (D.C.Cir.2006) (same).

4. According to the dissent, the statutory DNA collection procedure is a "full-scale personal DNA search[ ]" that exposes "exceptionally private information" to public view, including a "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct."

We disagree. Section 609.117, subdivision 1, authorizes the collection of DNA samples from a narrowly defined set of individuals convicted of a misdemeanor arising out of the same set of circumstances that provided probable cause for a felony charge. The governmental use of the data is to determine a DNA profile for the limited purpose of criminal identification. Further, access to the information is restricted to law enforcement officers conducting criminal investigations. In summary, nothing in Minn.Stat. § 609.117, subd. 1, authorizes a full-scale personal DNA search that exposes "exceptionally private information" to public view, including a "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." Rather, Minn.Stat. § 299C.155 limits the use of the DNA profile to criminal identification. Specifically, subdivisions 3 and 4 provide that the DNA profile may be used only for criminal identification purposes. *Id.,* subds. 3, 4.

10 more broadly than the Fourth Amendment.[5] *Id.* at 18–19.

■ The State admits that the taking of M.L.M.'s biological specimen pursuant to section 609.117, subdivision 1(2), for criminal identification purposes constitutes a search within the meaning of the U.S. and Minnesota Constitutions. *See Bartylla,* 755 N.W.2d at 14 (analyzing DNA collection pursuant to section 609.117 as a Fourth Amendment search); *see also Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 618, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (concluding the collection of biological specimens is a Fourth Amendment search). Consequently, the question we must examine is the reasonableness of the search in this case.

The taking of DNA samples for identification purposes implicates two privacy interests: (1) an expectation of privacy in one's bodily integrity, and (2) an expectation of privacy in one's identity. *United States v. Kriesel,* 508 F.3d 941, 946–48 (9th Cir.2007); *United States v. Amerson,* 483 F.3d 73, 84 (2nd Cir.2007), *cited in Bartylla,* 755 N.W.2d at 16–17; *see also Skinner,* 489 U.S. at 617, 109 S.Ct. 1402 (explaining that the collection of urine intrudes on expectations of privacy that society has long recognized as reasonable because there are few activities in society more private than the passing of urine; most people describe it by euphemisms if they talk about it at all); *cf.* Minn.Stat.

§ 299C.155, subd. 3 (providing that DNA data contained in the centralized database is "private data on individuals"). We implicitly recognized these two privacy interests in *Bartylla* when we noted that "the physical intrusion involved in acquiring the DNA sample from Bartylla for purposes of identification was minimal." 755 N.W.2d at 18 n. 6. We emphasized in *Bartylla* that we need not and did not consider whether "an intrusion into Bartylla's body to obtain DNA for purposes other than identification [would] be minimal or [would] violate the Fourth Amendment" because those questions were not presented by the DNA sample collection in Bartylla's case.[6] *Id.*

In *State v. Johnson,* which was considered and released contemporaneously with this decision, we applied the totality-of-the-circumstances test adopted in *Bartylla* to conclude that Minn.Stat. § 609.117, subd. 1(1)—which requires a defendant charged with a felony and then convicted of a misdemeanor arising out of the same set of circumstances to provide a DNA sample for identification purposes—does not violate the prohibitions against unreasonable searches and seizures in the U.S. and Minnesota Constitutions. *State v. Johnson,* 813 N.W.2d 1, 7–11 (Minn.2012). In *Johnson* we expressly recognized that the taking of DNA samples for identification purposes implicates two privacy interests: (1) an expectation of privacy in one's bodily integrity, and (2) an expectation of privacy

**5.** One commentator has criticized the *Knights–Samson* totality of the circumstances test. *See* 5 Wayne R. LaFave, *Search & Seizure,* § 10.10(c) (4th ed.2004). But LaFave's criticisms of the *Knights–Samson* test would apply equally to felony and misdemeanor cases. In *Bartylla,* which was decided four years after LaFave's criticism, we adopted the *Knights–Samson* totality-of-the-circumstances test, and applied the test to a felony case. Pursuant to the doctrine of stare decisis, we do not overrule prior decisions absent a compelling reason. *State v. Martin,* 773 N.W.2d 89, 98 (Minn.2009). No compelling reason has been asserted to overturn *Bartylla,* and therefore we apply the *Knights–Samson* test in this case.

**6.** As discussed in more detail below, M.L.M. and Bartylla's DNA samples were collected for the same limited purpose—identification. We do not consider whether an intrusion into M.L.M.'s body to obtain DNA for purposes other than identification would violate the Fourth Amendment.

in one's identity. *Id.* at 8. We concluded the nature of the physical intrusion—DNA collection via buccal swab—was minimal and the conditions of Johnson's probation diminished his expectation of privacy in his identity. *Id.* at 7–8. Balancing the two relevant privacy interests against the substantial State interests identified in *Bartylla*, we concluded the taking of a DNA sample from Johnson pursuant to Minn. Stat. § 609.117, subd. 1(1), was not an unreasonable search. *Id.* at 9 (citing *Samson*, 547 U.S. at 848, 126 S.Ct. 2193; *Knights*, 534 U.S. at 118–19, 122 S.Ct. 587).

■ M.L.M.'s arguments parallel the arguments we addressed in *Johnson*. M.L.M. argues *Bartylla* applies only to the DNA samples taken from defendants convicted of a felony and incarcerated, who have a "severely diminished privacy expectation" and should not be extended to juveniles adjudicated delinquent of a misdemeanor. In *Bartylla*, we adopted the *Knights–Samson* totality-of-the-circumstances test to determine whether a particular search is reasonable. Consequently, we must examine the nature of the physical intrusion on M.L.M.'s bodily integrity, and M.L.M.'s reasonable expectation of privacy in her identity. *See Bartylla*, 755 N.W.2d at 17–18; *see also Amerson*, 483 F.3d at 84–85.

Here, the prosecutor determined that there was probable cause to petition M.L.M. for felony possession of burglary tools, in violation of Minn.Stat. §§ 609.59 and 609.05, and M.L.M. did not seek dismissal of the felony petition for lack of probable cause.[7] M.L.M. later pleaded guilty to gross misdemeanor theft over $500, and the district court adjudicated M.L.M. delinquent and imposed a sentence consisting of six days of sentence-to-service and placed M.L.M. on probation until age 19, subject to specific conditions. The conditions included random urinalyses and counseling. M.L.M. also signed a probation contract, which imposed additional conditions, including continued reporting to the probation officer, submission to warrantless searches as requested, and a prohibition against possessing a firearm.

We conclude that the physical intrusion of M.L.M.'s bodily integrity to acquire the DNA sample from M.L.M. is minimal, especially when compared to the other intrusions M.L.M. is subjected to as part of her probation, including random urinalysis. Moreover, the physical intrusion on M.L.M.'s bodily integrity—a buccal swab inside M.L.M.'s cheek—is no greater than the intrusion in *Bartylla*, which we held constituted a minimal intrusion. *Bartylla*, 755 N.W.2d at 17–18.

We next examine whether M.L.M. had a reasonable expectation of privacy in her identity. We have recognized that there is a hierarchy of expectations of privacy, such that incarcerated prisoners have less of a privacy expectation than probationers, parolees, or conditional releasees. *Id.* at 17; *State v. Anderson*, 733 N.W.2d 128, 139 (Minn.2007) (concluding that a defendant's "reasonable expectation of privacy was diminished merely by virtue of his status as a probationer"). In *Amerson*, 483 F.3d at 86, the Second Circuit concluded that "a probationer's expectation of pri-

---

7. We note that a child alleged to be delinquent because of a felony or gross misdemeanor shall be charged by petition. Minn. R. Juv. Delinq. P. 6.03. Moreover, a petition cannot be filed without a prosecutor's signature, acknowledging that reasonable grounds exist to support the petition, and the district court has the authority to order the prosecutor to make a showing of probable cause in addition to that set forth in the petition. Minn. R. Juv. Delinq. P. 6.03, 6.05. The district court did not make such a request in this case.

vacy in his or her identity is severely diminished." Like the court in *Amerson*, we conclude that M.L.M.'s status as a probationer significantly reduced her expectation of privacy *in her identity*.[8]

■ M.L.M. argues that DNA collection from juvenile misdemeanants pursuant to section 609.117, subdivision 1(2), violates the policy of confidentiality of a juvenile delinquency proceeding. Minnesota Statutes §§ 260B.163, subd. 1(c), and 260B.171, subd. 4(b) (2010), provide that juvenile court proceedings are closed to the public, subject to certain enumerated exceptions, and that the release of juvenile records requires a court order. *See also* Minn. R. Juv. Delinq. P. 2.01; 30.02, subd. 3. We have stated that "[t]he policy of keeping juvenile court records confidential is rehabilitative" and the confidential nature of juvenile records provides "incentives to keep out of trouble." *State v. Schilling*, 270 N.W.2d 769, 772 (Minn.1978).

■ But the Legislature created an exception to those confidentiality protections in section 609.117, subdivision 1(2).[9] Specifically, subdivision 1(2) provides that the court shall order certain juvenile offenders to submit a DNA sample for analysis and then require that the sample or the results of the analysis be placed in the BCA database. Consequently, the Legislature has established a general policy of confidentiality of juvenile proceedings, and then created an exception to those confidentiality protections. These statutes express the public policy judgments of the Legislature. It is not our role to second-guess these policy judgments. *See Irongate Enters., Inc. v. County of St. Louis*, 736 N.W.2d 326, 331 (Minn.2007) ("[A]ny disagreement with the policy underlying [the legislature's] decision or the rule should be directed to the legislature."); *see also Int'l Bhd. of Elec. Workers, Local No. 292 v. City of St. Cloud*, 765 N.W.2d 64, 68 (Minn. 2009) ("It is the duty of this court to apply the law as written by the legislature."). While M.L.M. may disagree with the policy decision of the Legislature, she has failed to articulate a reason why the Legislature's decision to create an exception to juvenile confidentiality is unlawful.

Moreover, the data in the system derived from DNA samples collected from

---

**8.** The dissent contends that M.L.M.'s expectation of privacy in biological specimens containing her DNA is "essentially the same" as an "ordinary citizen." We disagree for several reasons. First, M.L.M. was petitioned for a felony offense and adjudicated delinquent of a misdemeanor arising out of the same set of circumstances. Thus, M.L.M. is no ordinary citizen. Additionally, M.L.M. was required as a condition of probation to submit to ongoing random urinalyses, which diminishes her expectation of privacy. *See Skinner*, 489 U.S. at 617, 109 S.Ct. 1402 ("[T]he collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable...."). It is unreasonable to suggest that a person retains an ordinary citizen's "high expectation of privacy in his or her DNA," when the person's expectation of privacy has been reduced by the conditions of her probation, including suspicionless analysis of her urine (which contains her DNA). There is no material distinction between ran-

dom urinalysis, which is used to determine whether the person is using alcohol or drugs, and a DNA profile, which is used to determine whether the person left DNA at a crime scene. In both situations, the government collects a biological specimen that is used by a restricted number of persons for a limited and legitimate governmental interest.

**9.** Previously, the court of appeals addressed the interaction of the general policy of juvenile confidentiality and Minn.Stat. § 609.3461 (1990) (renumbered in 1999 as section 609.117), which required a juvenile to provide a biological specimen when the juvenile was adjudicated delinquent of certain enumerated offenses. *In re the Welfare of Z.P.B.*, 474 N.W.2d 651, 654 (Minn.App.1991). The court of appeals concluded that confidentiality protections are statutory, and therefore may be modified by the Legislature. *Id.*

juveniles pursuant to section 609.117, subdivision 1(2), are protected by the restrictions in Minn.Stat. § 299C.155, subd. 3. The statute provides that the database "may only be accessed by authorized law enforcement personnel and used solely for law enforcement identification purposes," because the data is "private data on individuals." *Id.* Consequently, the DNA sample is placed in a database that is only available to law enforcement, not the public. *Id.* Thus, M.L.M.'s argument that section 609.117, subdivision 1(2), violates the policy of confidentiality of juvenile proceedings lacks merit.

On the other side of the totality-of-the-circumstances analysis is "the degree to which [the DNA collection] is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848, 126 S.Ct. 2193. Here, the State's interests in DNA collection under section 609.117, subdivision 1(2), are the same interests addressed in *Bartylla* and *Johnson*, which include "exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes." *Johnson*, 813 N.W.2d at 7; *Bartylla*, 755 N.W.2d at 18. These substantial interests apply equally whether the offender is adjudicated delinquent of a felony or of a misdemeanor arising out of the same circumstances as a felony petition.[10] Balancing the State's legitimate governmental interests in DNA collection against M.L.M.'s reduced expectation of privacy in her identity, we conclude that, as applied here, the statutorily-mandated collection of M.L.M.'s DNA for criminal identification purposes pursuant to section 609.117, subdivision

1(2), does not violate the U.S. or Minnesota Constitutions.

M.L.M. argues *In re the Welfare of C.T.L.*, 722 N.W.2d 484 (Minn.App.2006), supports her argument that only a felony conviction would satisfy the totality-of-the-circumstances analysis. *C.T.L.* involved individuals charged, but not yet convicted of a crime, and therefore is distinguishable. The portions of Minn.Stat. § 299C.105 (2010) at issue in *C.T.L.* applied only to DNA collection from juveniles and adults charged with specific felonies, and did not require a conviction prior to collecting DNA. *C.T.L.*, 722 N.W.2d at 488. The court of appeals concluded that the DNA collection was unreasonable under the totality-of-the-circumstances test because a charged individual does not have the same diminished expectation of privacy as a convicted individual, and therefore the State's interests did not outweigh the expectation of privacy of an individual prior to conviction. *Id.* at 491–92. We adopt the same conclusion as we adopted in *Johnson*, and conclude that because M.L.M. has been adjudicated delinquent of a gross misdemeanor arising out of the same set of circumstances as a felony petition, her situation is distinguishable from individuals who have been charged but not convicted of any offense.

Finally, M.L.M. argues that decisions from other state courts support her conclusion that a felony conviction is required before DNA may be collected. We rejected a similar argument in *Johnson*, and we conclude here as well that foreign jurisdictions have not uniformly determined what type of offense or severity level of punish-

---

**10.** The dissent contends that the State failed to prove that DNA collection was necessary to promote legitimate State interests. But M.L.M. did not challenge the State's assertion that its interests in DNA collection were the same as in *Bartylla*—"exonerating the inno-

cent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes." Rather, M.L.M. argued that her privacy interest outweighs the State's interests.

ment allows for DNA-sample collection, and M.L.M.'s argument that foreign jurisdictions support a bright-line exclusion of misdemeanants is incorrect. Rather, the courts have applied a totality-of-the-circumstances test to the facts of each case.

In summary, we conclude that when a juvenile is adjudicated delinquent of a gross misdemeanor offense that arises out of the same set of circumstances as a felony petition and that juvenile's sentence includes probation with conditions such as random urinalyses, there is a significant reduction in that juvenile's expectation of privacy in his or her identity. Additionally, the State's interests in exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure to victims of unsolved crimes are substantial. Applying the totality-of-the-circumstances test to the facts of this case, we conclude that DNA collection by buccal swab for identification purposes is not an unreasonable search. Accordingly, we conclude that the statutorily mandated collection of M.L.M.'s DNA pursuant to section 609.117, subdivision 1(2), does not constitute an unreasonable search or seizure under the U.S. or Minnesota Constitutions.

## II.

■ M.L.M. argues that Minn.Stat. § 609.117, subd. 1(2), deprives her of her right to equal protection of the laws in violation of the U.S. and Minnesota Constitutions. Specifically, she contends that the statute is unconstitutional because it requires a juvenile petitioned for a felony and then adjudicated delinquent of a misdemeanor arising out of the same set of circumstances to provide a DNA sample, but does not require a DNA sample from juveniles adjudicated delinquent of a misdemeanor but not petitioned for a felony. The State counters that these two catego-

ries of misdemeanants are not similarly situated, and therefore no equal protection violation exists.

■ The constitutionality of a statute presents a question of law that we review de novo. *State v. Melde,* 725 N.W.2d 99, 102 (Minn.2006). In the equal protection context, we presume Minnesota statutes are constitutional when they do not involve a fundamental right or a suspect class. *See State v. Benniefield,* 678 N.W.2d 42, 45 (Minn.2004). The party challenging the constitutionality of a statute bears "the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *State v. Behl,* 564 N.W.2d 560, 566 (Minn.1997).

■ The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Article I, Section 2 of the Minnesota Constitution provides that "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." We have previously concluded "[b]oth clauses have been analyzed under the same principles." *Kolton v. Cnty. of Anoka,* 645 N.W.2d 403, 411 (Minn.2002). Specifically, the "Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *see also Behl,* 564 N.W.2d at 568 (stating that equal protection "does not require the state to treat things that are different in fact or opinion as though they were the same in law").

Our precedent establishes different tests for rational basis review. First, the "similarly situated" test states that a statute

violates equal protection when it "prescribes different punishments or different degrees of punishment for the same conduct committed under the same circumstances by persons similarly situated." *State v. Frazier*, 649 N.W.2d 828, 837 (Minn.2002). Additionally, we have applied the three-prong *Russell* test to equal protection claims. *Benniefield*, 678 N.W.2d at 46.

The threshold question in an equal protection claim is whether the claimant is treated differently from others to whom the claimant is similarly situated in all relevant respects. *State v. Cox*, 798 N.W.2d 517, 521–22 (Minn.2011). We impose this threshold showing because the Equal Protection Clause does not require that the State treat persons who are differently situated as though they were the same. *Id.* at 521. Here, M.L.M. has not made this showing. M.L.M., as a juvenile misdemeanant with a dismissed felony petition, is not similarly situated to a misdemeanant who was not petitioned for a felony. Specifically, M.L.M. was petitioned for felony possession of burglary tools, gross misdemeanor theft over $500, gross misdemeanor damage to property, and misdemeanor fleeing a police officer. The petition was signed by the prosecutor and supported by a statement of probable cause. *See* Minn. R. Juv. Delinq. P. 6.03, 6.05. While the felony charge was dismissed as part of the plea agreement, the felony charge supports the conclusion that this conduct was more serious than conduct supporting only a gross misdemeanor. Objectively, M.L.M.'s situation as a juvenile misdemeanant with a dismissed felony charge is factually different from that of a juvenile misdemeanant who has not been petitioned for a felony. Consequently, we conclude that M.L.M. is not similarly situated to misdemeanants without a felony petition, and therefore her equal protection claim fails.

Accordingly, we hold that section 609.117, subdivision 1(2), does not violate the Equal Protection Clauses of the U.S. or Minnesota Constitutions by requiring M.L.M. to submit a DNA sample for analysis.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. M.L.M. was adjudicated delinquent for the purpose of rehabilitation. It is a disposition at the other end of the harmlessness scale from a sentence for a felony conviction. The collection and retention of the biological specimen for DNA implicate strong privacy interests apart from those intruded upon by the collection of the specimen, amount to full-scale personal DNA searches because of the potential for exposure of exceptionally private information contained in the DNA, and operate as a permanent burden on privacy. I would conclude that the State's interest in taking a biological specimen from a juvenile adjudicated as delinquent, without probable cause, does not outweigh the juvenile's privacy interest. I would hold that the DNA collection statute is unconstitutional as applied to a juvenile adjudicated to be delinquent for a gross misdemeanor.

I.

In December 2008, the State filed a petition in Hennepin County Juvenile Court, alleging M.L.M. to be a delinquent child because of criminal conduct. The petition alleged that 15–year–old M.L.M. and another juvenile drew the attention of Loss Prevention personnel at a store in a shopping mall. The two girls were rapidly selecting clothing. Loss Prevention contacted local police who monitored the situation over a two-way radio. As the

surveillance continued, Loss Prevention radioed that security sensors had been found in changing stalls just vacated by the girls. Loss Prevention also indicated that many items were missing from the stalls and that both girls were carrying full bags. The girls left the store and then ran when Loss Prevention approached. The police responded to the mall parking lot. Loss Prevention directed the police to an overflow lot. The police spotted the girls, called for them to stop, and apprehended them in a nearby building. M.L.M. was found in possession of clothing from the store and a pair of scissors, allegedly used to remove security sensors.

By delinquency petition, the State charged M.L.M. with felony possession of burglary tools (aiding and abetting), Minn. Stat. §§ 609.59, 609.05 (2010); gross misdemeanor theft over $500 (aiding and abetting), Minn.Stat. §§ 609.52, subds. 2(1), 3(4) (2010), 609.05; gross misdemeanor damage to property (aiding and abetting), Minn.Stat. §§ 609.595, subd. 2(a) (2010), 609.05; and misdemeanor fleeing a peace officer, Minn.Stat. § 609.487, subd. 6 (2010). Pursuant to an agreement with the State, M.L.M. admitted the charge of gross misdemeanor theft of property valued over $500.

The court adjudicated M.L.M. to be a delinquent child as to gross misdemeanor theft, and ordered her to complete six days of sentence-to-service, with 2 days waived if done within 120 days. The court placed M.L.M. on probation until age 19, subject to an earlier discharge date if recommended by the probation department. Pursuant to Minn.Stat. § 609.117, subd. 1(2), (2010),[1] which requires the collection of a DNA specimen from any juvenile petitioned for a felony offense and adjudicated a delinquent child for "any offense arising out of the same set of circumstances," the court ordered M.L.M. to provide a biological specimen for DNA analysis. The court denied M.L.M.'s motion to declare the statute unconstitutional as applied to a juvenile not adjudicated delinquent for a felony. The court found that the statute did not violate the prohibition against warrantless searches or deny equal protection under the U.S. or Minnesota Constitutions. The court also denied M.L.M.'s motion to stay entry of that order pending the appeal of *State v. Johnson*, 777 N.W.2d 767 (Minn.App.2010). The court of appeals affirmed.

M.L.M. challenges the constitutionality of Minn.Stat. § 609.117, subd. 1(2), arguing that the statute authorizes a warrantless, suspicionless search in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 10, of the Minnesota Constitution. The State argues that the statute is constitutional because the substantial governmental interests identified in *State v. Bartylla*, 755 N.W.2d 8, 18–19 (Minn.2008), to uphold the constitutionality of the collection of a biological specimen for DNA from convicted felony offenders, apply equally to juvenile misdemeanants and outweigh M.L.M.'s diminished expectation of privacy.

---

1. Minn.Stat. § 609.117, subd. 1(2) provides:
   If an offender has not already done so, the court shall order an offender to provide a biological specimen for the purpose of DNA analysis as defined in section 299C.155 when:

   . . . .

   (2) the juvenile court adjudicates a person a delinquent child who is petitioned for

   committing or attempting to commit a felony offense and is adjudicated delinquent for that offense or any offense arising out of the same set of circumstances.
   The biological specimen or the results of the analysis shall be maintained by the Bureau of Criminal Apprehension as provided in section 299C.155.

## II.

The constitutionality of a statute is a question of law, which we review de novo. *Hamilton v. Comm'r of Pub. Safety,* 600 N.W.2d 720, 722 (Minn.1999). We presume that statutes are constitutional and will strike down a statute "with extreme caution and only when absolutely necessary." *Id.* The party challenging the statute has the burden of showing that the statute is unconstitutional beyond a reasonable doubt. *State v. Merrill,* 450 N.W.2d 318, 321 (Minn.1990).

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[2] "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 613–14, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The collection and analysis of a DNA sample through either a blood draw or a buccal swab is a search. *See Skinner,* 489 U.S. at 616, 109 S.Ct. 1402 (noting that analysis of blood reveals private facts); *United States v. Amerson,* 483 F.3d 73, 77 (2d Cir.2007) ("[T]he extraction and analysis of plaintiffs' blood for DNA-indexing purposes constitute[s] a search." (quoting *Nicholas v. Goord,* 430 F.3d 652, 658 (2d Cir.2005))). Fourth Amendment protections extend to children. *Safford Unified Sch. Dist. No. 1 v.*

*Redding,* 557 U.S. 364, 129 S.Ct. 2633, 2643–44, 174 L.Ed.2d 354 (2009) (holding that search of middle school student violated her Fourth Amendment rights); *Bartylla,* 755 N.W.2d at 14.

Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Established exceptions include "special needs," which apply "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring).

In *Griffin v. Wisconsin,* the Supreme Court used the "special needs" exception in upholding a warrantless search of a probationer's home pursuant to Wisconsin's search regulation and "reasonable grounds" to believe that contraband was present. 483 U.S. 868, 875–76, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). The Court balanced the special needs of the probation system and practicality of the warrant and probable-cause requirements against "the effect of dispensing with a warrant upon the probationer." *Id.* at 876, 107 S.Ct. 3164. The Court thought "it clear that the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable grounds,' as defined by the Wisconsin Supreme Court." *Id.*

---

**2.** Article I, Section 10, of the Minnesota Con-   stitution uses identical language.

Fourteen years later, the Court upheld the search of a probationer's home based on reasonable suspicion of arson. In so doing, the Court adopted a new totality-of-the-circumstances approach, in which:

[T]he reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

United States v. Knights, 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

Five year later, the Court applied the new Knights totality-of-the-circumstances balancing test in Samson v. California, holding that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." 547 U.S. 843, 857, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). Justice Stevens, joined by Justices Souter and Breyer, dissented, asserting that "neither Knights nor Griffin supports a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer." Id. at 857, 126 S.Ct. 2193 (Stevens, J., dissenting). Justice Stevens believed that special needs were required:

In special needs cases we have at least insisted upon programmatic safeguards designed to ensure evenhandedness in application; if individualized suspicion is to be jettisoned, it must be replaced with measures to protect against the state actor's unfettered discretion. Here, by contrast, there are no policies in place—no "standards, guidelines, or procedures," to rein in officers and furnish a

bulwark against the arbitrary exercise of discretion that is the height of unreasonableness.

Id. at 860–61, 126 S.Ct. 2193 (citations omitted) (quoting Delaware v. Prouse, 440 U.S. 648, 650, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Justice Stevens concluded: "We held in Knights ... that the balance favored allowing the State to conduct searches based on reasonable suspicion. Never before have we plunged below that floor absent a demonstration of 'special needs.'" Id. at 864, 126 S.Ct. 2193.

As explained more fully in my dissent in State v. Johnson, the Knights–Samson balancing test is of relatively recent origin and represents a sharp departure from prior Court decisions. 813 N.W.2d 1, 13–18 (Minn.2012). Nonetheless, in Bartylla, we adopted the Knights–Samson totality-of-the-circumstances balancing approach in ruling on the constitutionality of Minn. Stat. § 609.117 (2002), which at that time compelled the collection of a biological specimen for DNA analysis from an offender convicted of a qualified felony. 755 N.W.2d 8, 14, 17 (Minn.2008). We upheld the statute based on two important factors—the felony conviction and Bartylla's status as an incarcerated felon: "An incarcerated prisoner such as Bartylla has an even lower expectation of privacy than does a probationer, parolee, or conditional releasee." Id. at 17. We also noted that "[t]he question of whether we would apply Minn.Stat. § 609.117 (2006) to nonfelonies is not before us." Id. at 12 n. 2.

## III.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 16

L.Ed.2d 908 (1966).[3]  The Supreme Court has recognized that " '[t]he security of one's privacy against arbitrary intrusion by the police' " is " 'at the core of the Fourth Amendment' " and " 'basic to a free society.' " *Id.* (quoting *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)).  The Court "reaffirmed that broad view of the Amendment's purpose in applying the federal exclusionary rule to the States in *Mapp.*" *Id.*

In assessing the privacy interest in this case, we should first examine the extent to which compelled collection of a person's DNA would intrude upon the privacy of an ordinary citizen not charged with any crime.  That requires consideration of both the method of the intrusion and the person's expectation of privacy in his or her DNA. *See Bartylla,* 755 N.W.2d at 17–18.  We should then determine whether the privacy interest is reduced when the person is a juvenile, charged with a felony crime and adjudicated delinquent of a misdemeanor.  Finally, we should analyze and balance the privacy interest at stake against the extent to which DNA collection and analysis promote legitimate government interests.

### A.

I begin with analyzing the extent to which suspicionless collection of a person's DNA would intrude upon the privacy of an ordinary Minnesota citizen.  "[T]he Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Even a limited search of the outer cloth-ing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humili-ating experience." *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  In determining the reasonableness of a search, we must consider "the nature of the privacy interest upon which the search here at issue intrudes" and the degree to which the intrusion affects this interest.  *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).  "What [pri-vacy] expectations are legitimate varies, of course, with context, depending, for exam-ple, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." *Id.* at 654, 115 S.Ct. 2386 (citation omitted).  And "the legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State." *Id.*

We have concluded that the physical intrusion involved in acquiring the DNA sample by buccal swab is minimal. *State v. Bartylla,* 755 N.W.2d 8, 18 (Minn.2008).  But the second intrusion "is potentially a far greater intrusion than the initial ex-traction of DNA, since the state analyzes DNA for information and maintains DNA records indefinitely.  It is this intrusion that has caused the greatest concern among those of our colleagues who would strike down DNA-indexing statutes as un-constitutional." *Nicholas v. Goord,* 430 F.3d 652, 670 (2d Cir.2005); *see also Skin-ner,* 489 U.S. at 616, 109 S.Ct. 1402 ("The

---

**3.** Despite what appears to be a welter of dif-ferent conceptions of privacy, [Professor So-love] argue[s] that they can be dealt with under six general headings ... (1) the right to be let alone ...; (2) limited access to the self—the ability to shield oneself from un-wanted access by others; (3) secrecy—the concealment of certain matters from others; (4) control over personal information ...; (5) personhood—the protection of one's personal-ity, individuality, and dignity; and (6) intima-cy—control over, or limited access to, one's intimate relationships or aspects·of life.

Daniel J. Solove, *Conceptualizing Privacy,* 90 Cal. L.Rev. 1087, 1092 (2002).

ensuing chemical analysis of the [blood] sample to obtain physiological data is a further invasion of the tested employee's privacy interests.").

DNA is often referred to as the "blueprint" for life. *See United States v. Shea,* 957 F.Supp. 331, 333 (D.N.H.1997). "DNA stores and reveals massive amounts of personal, private data about that individual," including information about that "person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." *United States v. Kincade,* 379 F.3d 813, 842 n. 3 (9th Cir.2004) (Gould, J., concurring). "Moreover, DNA contains information relating to hereditary characteristics, and thus the collection of such information also may reveal information about profiled individuals' family members." *United States v. Weikert,* 504 F.3d 1, 16 (1st Cir. 2007). Genetic information is not only "information about us," but also "information about our parents, our siblings, and our children." George J. Annas, *Genetic Privacy: There Ought to be a Law,* 4 Tex. Rev. L. & Pol. 9, 10 (1999). It has been described as a "reverse diary" that "informs our younger selves about our aging selves." *Id.* at 11. DNA "can provide insights into personal family relationships, disease predisposition, physical attributes, and ancestry." Tania Simoncelli, *Dangerous Excursions: The Case Against Expanding Forensic DNA Databases to Innocent Persons,* 34 J.L. Med. & Ethics 390, 392 (2006). It has been suggested that future research might reveal a genetic "predisposition to such behavior as rage and violence." *See* Robert H. Bork, *The*

*Challenges of Biology for Law,* 4 Tex. Rev. L. & Pol. 1, 2 (1999).

"Law enforcement officials are beginning to engage in a process known as 'familial searching' which relies on information taken from DNA samples rather than fingerprints. Because of the genetic similarity of close relatives, law enforcement is collecting DNA from family members to track down a perpetrator whose DNA was found at the scene of a crime." Larry Frankel, *Privacy and the Georgia Constitution: Protecting Information in the DNA Data Bank,* 2 J. Marshall L.J. 23, 32 (2009) (footnote omitted).

The significance of DNA—indeed, the only reason for collecting biological specimens for DNA—is the information it provides. Biological specimens obtained for DNA have the potential to reveal extremely personal information. *State v. Raines,* 383 Md. 1, 857 A.2d 19, 63 (2004) (Bell, C.J., dissenting) ("Unlike fingerprints, which contain all of the useable identifying information at the time the prints are taken, the DNA search does not end with the swab. To the contrary, the swab is then subjected to scientific tests, which may extract very sensitive, personal, and potentially humiliating information.").[4] Given the potential of DNA technology to expose extremely private information, I find these full-scale personal DNA searches highly intrusive.

Additionally, as for databases, there is the presumption of regularity that means, "absent affirmative evidence that a database is kept in a shoddy or substandard fashion, courts will assume the soundness

---

4. The collection and retention of DNA in a centralized databank also "carries with it all of the dangers inherent in allowing the government to collect and store information about its citizens in a centralized place." *Kincade,* 379 F.3d at 843 (Reinhardt, J., dissenting) (citing use of centralized information in Hoover–era FBI to terrorize civil rights leaders, government surveillance and McCarthy–era interrogation of alleged communists and alleged communist sympathizers, the Palmer Raids, and the roundup of Japanese Americans during World War Two).

of the information generated." Erin Murphy, *Databases, Doctrine & Constitutional Criminal Procedure,* 37 Fordham Urb. L.J. 803, 823 (2010). Yet databases "tend to be the product of numerous actors and inputs and collate numerous tiers of information." *Id.* at 827.

> The DNA database is in itself largely a fiction; even the name of the federal database, CODIS, reveals as much. CODIS, or the Combined DNA Index System, in fact refers not to a central repository of information, but rather to the software used by the individual law enforcement entities that have met the standards and entered into an agreement to share data. Each local or state entity uploads basic information to a centralized repository, and automated or intentional searches then indicate matches that can be pursued by contacting the uploading agency. Thus, to the extent that CODIS even exists, it incarnates as a pointer system—it tells a user where to look for the source information to which they have generated a match. Moreover, the stored information itself is a product of a chain of information generation: the chemical and mechanical technologies required to type and analyze a genetic sample, the analyst who must interpret and enter the data, and the engineers that write the software code and maintain and superintend the databases themselves.

*Id.* at 827–28 (footnote omitted).

"[R]oughly one hundred thousand times a day a biometric profile will be checked against crime scene samples[.]" Erin Murphy, *Paradigms of Restraint,* 57 Duke L.J. 1321, 1391 (2008). Errors in the handling of DNA samples and DNA typing have "resulted in wrongful arrests and incarceration." *Id.* at 1392. In addition to the DNA profile, Minnesota, like most states, allows "indefinite retention of the actual physical sample, which contains the individual's entire genetic code." *Id.* at 1329.

Minnesota's DNA collection statute recognizes that our citizens have a protected privacy interest in DNA information. Data contained in the DNA database is classified as private data under the Minnesota Government Data Practices Act. *See* Minn.Stat. § 299C.155, subd. 3. To be sure, the DNA collection process contains safeguards to protect privacy. The information stored in the DNA database is not the full DNA sequence, but a DNA profile—a set of numbers based on comparisons of the repetitions in thirteen "non-coding" locations on the human genome. But the fact that these regions are currently believed to contain no genetic information does not guarantee that they will never reveal traits. "Recent studies have begun to question the notion that junk DNA does not contain useful genetic programming material." *Kincade,* 379 F.3d at 818 n. 6 (plurality opinion). Indeed, it has already been suggested that "junk DNA" may contain information about " 'genetic defects, predispositions to diseases, and perhaps even sexual orientation.' " *Id.* at 850 (Reinhardt, J., dissenting) (quoting Harold J. Krent, *Of Diaries and Data Banks: Use Restrictions Under the Fourth Amendment,* 74 Tex. L.Rev. 49, 95–96 (1995)). These concerns are sometimes dismissed as needless worry about speculative future developments. But in genetics, a field in which new discoveries are continually and rapidly made, a complete evaluation of the privacy risks must take into account not only what we currently know, but what might be known in the future.

Furthermore, the statute's privacy protections are focused on DNA *profiles.* The biological specimens are far less controlled. The statute requires the BCA to "maintain, preserve, and analyze human

*biological specimens* for DNA." Minn.Stat. § 299C.155, subd. 3 (emphasis added). In other words, the statute requires the BCA to maintain not only the DNA profiles, but the biological specimens used to generate those profiles. A biological specimen contains far more information than a DNA profile. "[O]ne drop of blood .... is a complete record of your DNA." Annas, *supra,* at 10. As I wrote in *Johnson,* there are also important differences between collection of urine for purposes of a drug test and collection of a blood sample for purposes of indexing a DNA profile into a database. 813 N.W.2d 1, 21–22 (Minn.2012), (Meyer, J., dissenting). In conclusion, a person's DNA deserves the same constitutional protection as other very private and sensitive information; the ordinary citizen in Minnesota has a high expectation of privacy in his or her DNA.

### B.

I now turn to the question of whether a juvenile adjudicated delinquent for a gross misdemeanor has a reduced privacy interest that would subject him or her to a full-scale search of private DNA information. As I said in *Johnson,* "the consensus that privacy interests in DNA information are clear. We would not and should not countenance compelled collection of biological specimens from the ordinary citizen." 813 N.W.2d 1, 22 (Meyer, J., dissenting).

The U.S. Supreme Court has said that probation is "one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). "[D]ifferent options lie between those extremes, including confine-ment in a medium- or minimum-security facility, work-release programs, 'halfway houses,' and probation—which can itself be more or less confining depending upon the number and severity of restrictions imposed." *Id.* I would suggest that M.L.M.'s punishment was less severe than a comparable sentence for an adult.

M.L.M. was adjudicated delinquent for commission of a gross misdemeanor, a less severe punishment than an adult conviction. The purpose of M.L.M.'s adjudication was to rehabilitate. The juvenile court is to pursue this purpose "through means that are fair and just, that recognize the unique characteristics and needs of children, and that give children access to opportunities for personal and social growth." Minn.Stat. § 260B.001, subd. 2 (2010). Delinquency dispositions listed by statute are "deemed necessary to the rehabilitation of the child." Minn.Stat. § 260B.198, subd. 1 (2010). "[A]ny order for a disposition ... shall contain written findings of fact to support the disposition ordered and shall also set forth in writing the following information: (i) why the best interests of the child are served by the disposition ordered; and (ii) what alternative dispositions were considered by the court and why such dispositions were not appropriate in the instant case." *Id.,* subd. 1(13).

I would conclude that a juvenile adjudicated to be a delinquent child for a gross misdemeanor has essentially the same expectation of privacy in the inherently personal information contained in his or her DNA as the ordinary citizen. The juvenile and the State share a common interest in the juvenile justice system's dispositions, deemed necessary to the rehabilitation of the child and aimed at serving the best interests of the child. The need to protect the juvenile's information is made more compelling "when considering that Fourth

Amendment protections once lost, are likely lost forever." *United States v. Mitchell,* 681 F.Supp.2d 597, 607 (W.D.Pa.2009) (quoting *United States v. Stewart,* 468 F.Supp.2d 261, 279 (D.Mass.2007)), *rev'd,* 652 F.3d 387 (3d Cir.2011); *Kincade,* 379 F.3d at 837 ("[O]nce a person is convicted of one of the felonies included as predicate offenses under [the DNA Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling." (quoting *Rise v. Oregon,* 59 F.3d 1556, 1560 (9th Cir. 1995) (internal quotation marks omitted))).

The difference between a juvenile and an adult is important for sentencing purposes. The Supreme Court has cited three fundamental differences between juveniles and adults that render juveniles less culpable for their conduct: First, juveniles have "[a] lack of maturity and an underdeveloped sense of responsibility .... [which] often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons,* 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (quoting *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)) (internal quotation marks omitted). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* Third, "the character of a juvenile is not as well formed as that of an adult." *Id.* at 570, 125 S.Ct. 1183. The Court said that "personality traits of juveniles are more transitory, less fixed." *Id.* "As for deterrence," the Court said, "it is unclear whether the death penalty has a significant or even

measurable deterrent effect on juveniles." *Id.* at 571, 125 S.Ct. 1183.

DNA statutes involve "surveillance that extends far beyond [probationers'] periods of supervision." *Kincade,* 379 F.3d at 857 (Reinhardt, J., dissenting). In Minnesota, the burden on privacy apparently endures as long as the biological specimen remains in the DNA databank. *See* Minn.Stat. § 299C.155, subd. 3. In other words, DNA statutes operate as a permanent burden on privacy. *See* Paul M. Monteleoni, Note, *DNA Databases, Universality, and the Fourth Amendment,* 82 N.Y.U. L.Rev. 247, 270–71 (2007) ("While the government does not have to dispose of information that it obtains through lawful methods, a temporary diminution in privacy should not be the justification for an otherwise unlawful permanent burden on privacy."). And this permanent burden on privacy is accomplished by a statute that compels the collection of a biological specimen from a child charged for a crime but which the State had not proved guilt beyond a reasonable doubt.[5]

### C.

Finally, I analyze and balance the privacy interest at stake against the extent to which it promotes legitimate government interests.[6] The State argues that the governmental interests in collecting DNA samples from a juvenile adjudicated delinquent for a misdemeanor are the same as for collecting DNA samples from felony offenders: "exonerating the innocent, deterring recidivism, identifying offenders of past and future crimes, and bringing closure for victims of unsolved crimes." *Bartylla,* 755 N.W.2d at 18. Assuming the

---

5. The reasonable-doubt standard has constitutional stature. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

6. I want to emphasize again my belief that we have taken a wrong turn in our jurisprudence by balancing away two fundamental protections of the Fourth Amendment—the warrant and probable cause.

efficacy of these claimed interests,[7] we are to balance the totality of the circumstances in assessing the proper weight to be given each side.

In *United States v. Knights*, the Supreme Court upheld a warrantless search of a California probationer's apartment based on reasonable suspicion of criminal conduct and authorization by a condition of probation. 534 U.S. 112, 121–22, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In *Samson v. California*, the Court applied *Knights* to uphold the suspicionless search of a California parolee, stopped on the street, based on his status as a parolee and parole search condition. 547 U.S. 843, 846, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The nature of the privacy interests harmed in *Knights* and *Samson* implicated dignity and liberty. *See id.* at 856, 126 S.Ct. 2193 ("The concern that California's suspicionless search system gives officers unbridled discretion to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society, is belied by California's prohibition on 'arbitrary, capricious, or harassing' searches." (quoting *People v. Reyes*, 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445, 450, 451 (1998))); *Knights*, 534 U.S. at 119, 122 S.Ct. 587 ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)) (internal quotation marks omitted)).

In finding DNA collection statutes constitutional, courts routinely focus on the government's interest in creating a permanent identification record of convicted felons for law enforcement purposes. *E.g., United States v. Weikert*, 504 F.3d 1, 14 (1st Cir.2007) (concluding that "government's important interests in monitoring and rehabilitating supervised releasees, solving crimes, and exonerating innocent individuals outweigh Weikert's privacy interests, given his status as a supervised releasee, the relatively minimal inconvenience occasioned by a blood draw, and the coding of genetic information that, by statute, may be used only for purposes of identification"); *Padgett v. Donald*, 401 F.3d 1273, 1280 (11th Cir.2005) (holding that "Georgia's legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involved in taking prisoners' saliva samples and storing their DNA profiles, given prisoners' reduced expectation of privacy in their identities"); *United States v. Sczubelek*, 402 F.3d 175, 185 (3d Cir.2005) ("The interest in accurate criminal investigations and prosecutions is a compelling interest that the DNA Act can reasonably be said to advance.").

Even a person under lawful arrest has a diminished expectation of privacy in his own identity. "Taking of fingerprints in such circumstances is universally standard procedure, and no violation of constitutional rights." *Napolitano v. United States*,

---

**7.** The State has not substantiated those claimed interests, and data on the effectiveness of DNA indexing appears to be weak. *See* Frederick R. Bieber, *Turning Base Hits into Earned Runs: Improving the Effectiveness of Forensic DNA Data Bank Programs*, 34 J.L. Med. & Ethics 222, 222 (2006) ("Data compilations on meaningful metrics of success are critically lacking."); Mark A. Rothstein & Meghan K. Talbott, *The Expanding Use of DNA in Law Enforcement: What Role for Privacy?*, 34 J.L. Med. & Ethics 153, 154 (2006) ("[T]here is virtually no scientific, comprehensive, independent, peer-reviewed analysis quantifying the overall effectiveness of DNA databases in solving or preventing crimes."). As I said in *Johnson*, our discussion of the governmental interests in *Bartylla* is not controlling. 813 N.W.2d 1, 24–25 (Minn.2012) (Meyer, J., dissenting).

340 F.2d 313, 314 (1st Cir.1965). "Finger-prints, however, only identify the person who left them" and therefore "provide an [already] unequivocal, and in some respects, a better record of personal identity than forensic DNA typing." *United States v. Mitchell,* 681 F.Supp.2d 597, 608 (W.D.Pa.2009), *rev'd,* 652 F.3d 387 (3d Cir. 2011). "Monozygotic twins, for example, can be distinguished by their fingerprints, but not by their DNA." *Id.*

Nevertheless, "a fingerprint is limited to establishing identity, whereas a DNA sample has the potential to provide information about a person's genetic makeup, family relationships, and predisposition for certain diseases and medical conditions." Frankel, *supra,* at 29–30 (footnote omitted). "The legislative interest in DNA data bases has not been primarily to supplement or supplant fingerprints as markers of true identity; it has always been to generate investigative leads." Tracey Maclin, *Is Obtaining an Arrestee's DNA a Valid Special Needs Search Under the Fourth Amendment? What Should (and Will) the Supreme Court Do?,* 34 J.L. Med. & Ethics 165, 179 (2006) (quoting David H. Kaye, Commentary, *Two Fallacies About DNA Data Banks for Law Enforcement,* 67 Brook. L.Rev. 179, 203 (2001)) (internal quotation marks omitted). Accordingly, in assessing privacy interests implicated in the collection and retention of a DNA sample from a person convicted of a misdemeanor, our concern should focus on the genetic information contained in the DNA sample and not on the identity function of the DNA profile.

The court concludes that the conditions of M.L.M.'s probation—in particular random urinalysis—significantly reduce her expectation of privacy. The privacy inter-est upon which that condition intrudes concerns dignitary harms only for the term of M.L.M.'s probation. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (noting that for random urinalysis drug testing, "the degree of intrusion depends upon the manner in which production of the urine sample is monitored").

Further, "unlike drug or alcohol tests which measure the concentration of a substance at a particular point in time, DNA analysis maps immutable, lifelong characteristics of an individual." Maclin, *supra,* at 184 n. 105 (quoting Robert Craig Scherer, Note, *Mandatory Genetic Dogtags and the Fourth Amendment: The Need for a New Post–Skinner Test,* 85 Geo. L.J.2007, 2021 (1997)) (internal quotation marks omitted). While the taking of the sample might not be unreasonably intrusive, the second intrusion—analysis of the DNA sample and its retention in a databank—significantly intrudes upon M.L.M.'s expectation of privacy in a host of private matters.

As for the government interest, it is worth noting that before 1993 the DNA collection law mandated the collection of a biological specimen for DNA analysis from a child *adjudicated delinquent* for a *predatory offense.* Minn.Stat. § 609.3461, subd. 1(3) (1992). The Legislature amended the statute in 1993 to include a child who is *petitioned* for a predatory offense and *adjudicated delinquent for any offense arising out of the same set of circumstances.*[8] The statute was later renumbered and amended to include a child petitioned for a *qualifying felony* and adjudicated delinquent for any offense arising out of the

---

**8.** Act of May 20, 1993, ch. 326, art. 10, § 15, 1993 Minn. Laws 1974, 2096–97 (codified at Minn.Stat. § 609.3461, subd. 1(3) (1994)).

same set of circumstances.[9] The statute was again amended in 2005 to expand the class of qualifying offenses to any felony.[10]

M.L.M. was adjudicated a delinquent child for the commission of a misdemeanor property crime—aiding and abetting theft over $500—by removing merchandise from a store in full view of the store's Loss Prevention people. This conduct is less culpable than a comparable violation by an adult. The disposition is less onerous than an adult conviction for the same offense. DNA played no role in solving that crime. Under the facts in this case then, for balancing purposes, the government's only interest is in reducing recidivism through deterrence.

The practical impact of the legislative changes ensures that juvenile offenders cannot plead out of the DNA collection requirements. *Cf. State v. Lopez,* 778 N.W.2d 700, 704–05 (Minn.2010) (suggesting that similar change to predatory offender registration law was aimed at preventing defendants from using plea agreements to avoid registration).

I would conclude that the balance between the high expectation of privacy the ordinary citizen has in his or her DNA, the need to employ juvenile delinquency dispositions deemed necessary to the rehabilitation of the child, and the complete lack of evidence that the State's interests are served by searching a juvenile adjudicated delinquent for a gross misdemeanor, weighs decisively in favor of the conclusion that the search in this case violated the protections of the Fourth Amendment. The State has provided no support for the claim that its interests in collecting DNA samples from children adjudicated delinquent for misdemeanors are the same as for collecting DNA samples from felony offenders. I would therefore hold that the DNA collection statute, as applied to M.L.M., is unconstitutional beyond a reasonable doubt.[11]

---

9. Act of May 25, 1999, ch. 216, art. 3, §§ 7, 9, 1999 Minn. Laws 1271, 1314–16 (codified at Minn.Stat. § 609.117, subd. 1(3) (2000)).

10. Act of June 2, 2005, ch. 136, art. 12, § 9, 2005 Minn. Laws 901, 1064–65 (codified at Minn.Stat. § 609.117, subd. 1(2) (2010)).

11. Because I would hold that Minn.Stat. § 609.117, subd. 1(2), is unconstitutional under the Fourth Amendment as applied to M.L.M., I would not reach M.L.M.'s equal-protection argument.