JOHNSON, Judge (dissenting)
I would conclude that section 256D.024, subdivision 1(a), of the Minnesota Statutes requires Verhein to submit to random drug testing as a condition of receiving supplemental-aid benefits. I also would conclude that the random-drug-testing requirement in section 256D.024, subdivision 1(a), does not violate Verhein's rights under the Fourth Amendment to the United States Constitution. Accordingly, I would conclude that the commissioner properly determined that Verhein is ineligible for supplemental-aid benefits. Therefore, I respectfully dissent from the opinion of the court.
I.
The first issue raised by Verhein's appeal is whether she is required by statute to submit to random drug testing as a condition of receiving supplemental-aid benefits.
The parties' arguments require the court to engage in statutory interpretation. "The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous." State v. Thonesavanh , 904 N.W.2d 432, 435 (Minn. 2017). " 'A statute is ambiguous only if it is subject to more than one reasonable interpretation.' " Id. (quoting 500, LLC v. City of Minneapolis , 837 N.W.2d 287, 290 (Minn. 2013) ). If a statute is unambiguous, "then we must apply the statute's plain meaning." State v. Nelson , 842 N.W.2d 433, 436 (Minn. 2014) (quotation omitted). But if a statute is ambiguous, "then we may apply the canons of construction to resolve the ambiguity." Thonesavanh , 904 N.W.2d at 435. When interpreting a statute, we apply a de novo standard of review. Id.
A.
The text of subdivision 1(a) describes the group of persons who are required to submit to random drug testing as a condition of receiving certain welfare benefits. The description is found in the noun phrase that is the subject of the second sentence: "Persons subject to the limitations of this subdivision who become eligible for assistance under this chapter shall be subject to random drug testing as a condition of continued eligibility...." Minn. Stat. § 256D.024, subd. 1(a) (2016) (emphasis added).
To determine whether Verhein is among the "[p]ersons subject to the limitations of this subdivision who become eligible for assistance under this chapter," see id. , we first must identify the "limitations" at issue. The statute itself does not define the words "limitation" or "limitations." See Minn. Stat. § 256D.024. Likewise, the word is not among the terms defined elsewhere in chapter 256D. See Minn. Stat. § 256D.02 (2016). Because there is no statutory definition, we must look to "the common and ordinary meaning" of the words used in the statute. Thonesavanh , 904 N.W.2d at 436. The word "limitation" is defined by a leading lay dictionary to have four meanings, of which the most pertinent are "[t]he act of limiting or the state of being limited," "[a] restriction," and, in law, "[a] specified period during which, by statute, an action may be brought." The American Heritage Dictionary 1044 (3d ed. 1996). The same dictionary defines "limited" to mean "[c]onfined or restricted within certain limits," id. , and defines "limit" to mean "[t]he point, edge, or line beyond which something cannot or may not proceed," id.
*109 Although the statute uses the plural form of the word "limitation," in reality there is only one limitation in subdivision 1 of section 256D.024.[3] That limitation is the provision in the main clause of the first sentence, which makes an applicant "ineligible for benefits under this chapter until five years after the applicant has completed terms of the court-ordered sentence" on a disqualifying drug offense. See Minn. Stat. § 256D.024, subd. 1(a). That provision is a "limitation" because it causes a person's eligibility for benefits to be "[c]onfined or restricted within certain limits," i.e. , within a "point, edge, or line," which is five years after the person has completed the terms of his or her court-ordered sentence. See American Heritage, supra , at 1044. The three treatment-related exceptions to ineligibility, which are found in the "unless" clause of the first sentence, are not limitations. If any one of the three exceptions were to apply, it would negate or disable the limitation in the main clause of the first sentence. Regardless, all persons who might qualify for one of the three treatment-related exceptions are persons subject to the limitation in the main clause.
To determine whether Verhein is among the "[p]ersons subject to the limitations of this subdivision who become eligible for assistance under this chapter," see Minn. Stat. § 256D.024, subd. 1(a), we also must consider the ways in which a person may "become eligible for assistance under this chapter," see id. There are at least five ways. First, persons seeking general-assistance benefits may become eligible by satisfying the criteria in a statute captioned "eligibility for general assistance." See Minn. Stat. § 256D.05 (2016 & Supp. 2017). Second, persons seeking supplemental-aid benefits may become eligible by satisfying the criteria in the Minnesota Supplemental Aid Act. See Minn. Stat. § 256D.425 (2016 & Supp. 2017) ; see also Minn. Stat. § 256D.33 (2016). Third, persons seeking either type of benefits who were convicted of a drug offense after July 1, 1997, may become eligible five years after their completion of a court-ordered sentence. See Minn. Stat. § 256D.024, subd. 1(a). Fourth, persons seeking benefits who were convicted of a drug offense after July 1, 1997, may become eligible by participating in a drug treatment program, by successfully completing a drug treatment program, or by being assessed and determined not to be in need of drug treatment. See id. Fifth, persons seeking benefits who have been convicted of a drug offense after July 1, 1997, and who previously satisfied one of the three treatment-related exceptions but then lost eligibility because of a positive test result may become eligible again after the expiration of another five-year period. See id.
Verhein was convicted of a disqualifying drug offense in 1999. She became ineligible for supplemental-aid benefits at that time. See Minn. Stat. § 256D.024, subd. 1(a). She completed her court-ordered sentence in 2001. She became eligible again for supplemental-aid benefits in 2006. See id. Sometime thereafter, she applied for and began receiving supplemental-aid benefits, which implies that she satisfied the eligibility requirements in section 256D.425. Accordingly, she is a person "subject to the limitations of this subdivision who bec[a]me eligible for assistance under ... chapter [256D]." See id. Because the statute *110 is not "subject to more than one reasonable interpretation" in its application to Verhein, the statute is unambiguous for purposes of this appeal. See Thonesavanh , 904 N.W.2d at 435 (quotation omitted).
B.
Verhein contends that the statute does not apply to her because the reference in the second sentence to "the limitations of this subdivision" necessarily refers to "the limitation on MSA eligibility that appears immediately before it, in the first sentence of subd. 1(a), for individuals with drug convictions who are within the first five years after the completion of their sentence." She further contends, "There is no other 'limitation' anywhere in subd. 1 to which this second sentence could be referring." Verhein's interpretation is flawed because it ignores the main clause of the first sentence, which makes a person ineligible for benefits based on a disqualifying drug offense. See Minn. Stat. § 256D.024, subd. 1(a). She does not explain why that provision, which makes a person ineligible for benefits, is not a "limitation."
The majority reasons that the phrase "[p]ersons subject to the limitations of this subdivision who become eligible for assistance under this chapter" is ambiguous on the ground that it could refer either to persons who previously were subject to the five-year period of ineligibility or to persons who presently are subject to the five-year period of ineligibility. See supra at 102-03. But the phrase need not be interpreted to refer to only one group or the other; it could refer to both groups of persons. That is the only reasonable interpretation in light of the principle that, in determining whether a statute is ambiguous, we should consider a statute "as a whole and interpret its language to give effect to all of its provisions." State v. Riggs , 865 N.W.2d 679, 683 (Minn. 2015). In this case, we must give effect to the last word of the phrase: "chapter." If the phrase were limited to persons who still are within the five-year period of ineligibility, the phrase would conclude, "under this subdivision ," not "under this chapter ." Because the statute defines the group of persons subject to random drug tests more broadly to include persons who became eligible under any provision in chapter 256D, the statute refers to both types of persons, including persons who are beyond the five-year period of ineligibility and became eligible by satisfying the criteria in section 256D.05 and section 256D.425.
Furthermore, a related statute that expressly references section 256D.024 confirms this interpretation. The related statute, which was enacted in 2012, required the state court administrator to provide the commissioner with a report of all persons who had been convicted of felony-level drug offenses under chapter 152 after July 1, 1997, and, furthermore, requires the state court administrator, on an ongoing basis, to provide reports to the commissioner at six-month intervals of all persons convicted of such offenses during the previous six months. Minn. Stat. § 256.01, subd. 18c (2016) ; 2012 Minn. Laws ch. 247, art. 3, § 2, at 35-36. The statute further provides, "The commissioner shall determine whether the [persons included in the reports] are receiving public assistance under chapter 256D ... , and if [so], the commissioner shall instruct the county to proceed under section 256D.024...." Minn. Stat. § 256.01, subd. 18c(b). The information provided by the state court administrator, which includes all convictions after July 1, 1997, would be useful for purposes of section 256D.024 only if persons who are beyond the five-year period of ineligibility are still subject to random drug testing. In determining whether a statute is ambiguous, we should "interpret each section in light of the surrounding *111 sections to avoid conflicting interpretations." Eclipse Architectural Grp., Inc. v. Lam , 814 N.W.2d 692, 701 (Minn. 2012) (quotation and alteration omitted). In doing so, we may consider statutory provisions in related chapters of the Minnesota Statutes. See State v. Schmid , 859 N.W.2d 816, 822-23 (Minn. 2015) (interpreting provision in chapter 97B by referring to provisions in chapter 97A). Because section 256.01, subdivision 18c, ensures that the commissioner is aware of all persons who have been convicted of drug offenses since July 1, 1997, and because the statute directs the commissioner to use that information to enforce section 256D.024, it is apparent that persons who are beyond the five-year period of ineligibility are subject to random drug testing.
C.
If I were to agree with the majority's opinion that the statute is ambiguous, I would respectfully disagree with its view that the legislative history of the statute is "inconclusive" with respect to the meaning of the phrase "[p]ersons subject to the limitations of this subdivision who become eligible for assistance under this chapter." See supra at 104. If the legislative history sheds any light on the meaning of section 256D.024, subdivision 1(a), it makes clear that the phrase includes persons who previously were subject to the five-year period of ineligibility. That is so because the "subject to the limitations" language was inserted into the bill at a time when the first sentence consisted only of the clause that contains the five-year ineligibility provision. The "subject to the limitations" language was inserted into the bill before the "unless" clause, which contains the three treatment-related exceptions to ineligibility.
When the bill, Senate File 1, was passed by the senate, it provided as follows: "If an applicant has been convicted of a drug offense after July 1, 1997, the assistance unit is ineligible for benefits under this chapter until two years after the applicant has completed terms of the court-ordered sentence." S.F. 1, § 27, subd. 1, third engrossment (1997). In the following paragraph, the bill defined the term "drug offense" in the same manner as the statute now defines it. Compare S.F. 1, § 27, subd. 1, third engrossment (1997) with Minn. Stat. § 256D.024, subd. 1(b).
In the house of representatives, the bill was amended in committee to extend the period of ineligibility from two years to five years. State of Minnesota, Journal of the House , 80th Sess. 1338 (Mar. 26, 1997). When the bill reached the floor of the house of representatives, a member moved to amend the bill by adding the second sentence, as shown below:
If an applicant has been convicted of a drug offense after July 1, 1997, the assistance unit is ineligible for benefits under this chapter until five years after the applicant has completed terms of the court-ordered sentence. Persons subject to the limitations imposed by this section who become eligible for assistance under this chapter shall be subject to random drug testing as a condition of continued eligibility and shall lose eligibility for benefits beginning the month following any positive test result for an illegal controlled substance.
State of Minnesota, Journal of the House , 80th Sess. 1898 (Apr. 10, 1997); S.F. 1, § 28, subd. 1, second unofficial engrossment (1997). The motion carried, and the house passed the entire bill shortly thereafter. State of Minnesota, Journal of the House , 80th Sess. 1898, 1904-05 (Apr. 10, 1997).
The senate did not agree to the house version of the bill. State of Minnesota, Journal of the Senate , 80th Sess. 1716 *112 (Apr. 11, 1997). A conference committee was appointed. Id. The conference committee reported out a bill that differed from the house version, as shown below:
If an applicant has been convicted of a drug offense after July 1, 1997, the assistance unit is ineligible for benefits under this chapter until five years after the applicant has completed terms of the court-ordered sentence , unless the person is participating in a drug treatment program, has successfully completed a drug treatment program, or has been assessed by the county and determined not to be in need of a drug treatment program. Persons subject to the limitations imposed by this section of this subdivision who become eligible for assistance under this chapter shall be subject to random drug testing as a condition of continued eligibility and shall lose eligibility for benefits for five years beginning the month following :
(1) any positive test result for an illegal controlled substance ; or
(2) discharge of sentence after conviction for another drug felony.
State of Minnesota, Journal of the Senate , 80th Sess. 2522 (Apr. 28, 1997). Both chambers approved the conference committee version of the bill, and it was presented to the governor, who signed it. 1997 Minn. Laws ch. 85, art. 3, § 28, at 615-16; State of Minnesota, Journal of the Senate , 80th Sess. 2566 (Apr. 28, 1997); State of Minnesota, Journal of the House , 80th Sess. 3401-02 (Apr. 28, 1997).
The significance of this chronology is that, at the time the random-drug-testing requirement was inserted into the bill on the floor of the house of representatives, the only conceivable "limitation" in the bill was the five-year period of ineligibility. At that time, the bill did not yet contain the three treatment-related exceptions to ineligibility. If the word "limitation" had any meaning at the time it was inserted into the bill, it could have referred only to the five-year period of ineligibility and not to the three treatment-related exceptions. Accordingly, at that time, the phrase "[p]ersons subject to the limitations of this subdivision who become eligible for assistance under this chapter" must have meant persons who had completed a court-ordered sentence and had become eligible for benefits five years after completing a court-ordered sentence. Thus, if the legislative history informs the interpretation of section 256D.024, subdivision 1(a), it must lead to the conclusion that persons who previously were ineligible for benefits and became eligible due to the passage of five years' time are included in the group of persons who are required to submit to random drug testing as a condition of ongoing eligibility for benefits.
D.
If I were to agree with the majority that the statute is ambiguous, I also would not resolve the ambiguity by referring to the department of human services' combined manual. See supra at 105-07.
As an initial matter, I question the legal authority by which we might interpret a statute in a manner consistent with an agency's prior interpretation but inconsistent with the agency's litigation position. To be sure, if an agency refers to its prior interpretation of an ambiguous statute to support its position in a pending case, a court may "give deference to the administrative interpretation of the relevant statute by a state agency if the agency is charged with the responsibility of applying the statute on a statewide basis and its interpretation is reasonable." A.A.A. v. Minnesota Dept. of Human Servs. , 832 N.W.2d 816, 823 (Minn. 2013). But I am unaware of any authority for giving such deference to an agency's prior interpretation *113 of a statute if the prior interpretation is offered not by the agency but by the agency's opposing party.
Assuming without conceding that we may do so, I would not give deference to the department's combined manual in this case because the manual does not answer the question before the court. The combined manual does not address the situation in which an applicant or recipient completed a court-ordered sentence more than five years earlier. In these circumstances, it would be improper to draw any inference from the combined manual's silence, especially an inference that is contrary to the commissioner's position in this appeal.
Thus, I would conclude that section 256D.024, subdivision 1(a), requires Verhein to submit to random drug testing as a condition of receiving supplemental-aid benefits.
II.
The second issue raised by Verhein's appeal is whether the random-drug-testing requirement in section 256D.024, subdivision 1(a), violates her rights under the Fourth Amendment to the United States Constitution.[4] The majority does not reach this issue because it concludes that the statute does not apply to Verhein. See supra at 99-107. Because I would conclude that the statute applies to Verhein, I must consider and resolve her Fourth Amendment argument before reaching a conclusion as to whether she was properly denied supplemental-aid benefits.
The Fourth Amendment to the United States Constitution provides,
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV ; see also Minn. Const. art. I, § 10. As a general rule, a warrantless search of a person is unreasonable and, thus, a violation of the Fourth Amendment. Birchfield v. North Dakota , --- U.S. ----, 136 S.Ct. 2160, 2173, 195 L.Ed.2d 560 (2016) ; Missouri v. McNeely , 569 U.S. 141, 148, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013) ; State v. Stavish , 868 N.W.2d 670, 675 (Minn. 2015).
Despite the general rule, a warrantless search of a person may be valid under the Fourth Amendment in certain circumstances. For example, a warrantless search of a person is valid if he or she consents to the search. Schneckloth v. Bustamonte , 412 U.S. 218, 219, 248-49, 93 S.Ct. 2041, 2043-44, 2059, 36 L.Ed.2d 854 (1973) ; State v. Brooks , 838 N.W.2d 563, 568 (Minn. 2013). A warrantless search of a person may be justified by exigent circumstances, so long as there is probable cause to believe that the person has engaged in criminal activity. McNeely , 569 U.S. at 148, 133 S.Ct. at 1558 ; Stavish , 868 N.W.2d at 677. And a person who has been lawfully arrested may be subjected to a warrantless search incident to the arrest. Arizona v. Gant , 556 U.S. 332, 338, 351, 129 S.Ct. 1710, 1716, 1723-24, 173 L.Ed.2d 485 (2009) ; State v. Bernard, 859 N.W.2d 762, 766-68, 772 (Minn. 2015), aff'd sub nom., Birchfield , --- U.S. ----, 136 S.Ct. 2160.
*114 Furthermore, a warrantless search of a person may be valid under the Fourth Amendment even without probable cause of criminal activity, if there exist "special needs, beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impracticable." Vernonia Sch. Dist. 47J v. Acton , 515 U.S. 646, 653, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995) (quotation omitted); see also Stavish , 868 N.W.2d at 675.
A.
In this case, the Fourth Amendment analysis must begin with Wyman v. James , 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), an opinion of the United States Supreme Court concerning facts that are quite similar to the facts of this case. A New York statute required recipients of certain welfare benefits to allow social workers to conduct home visits as a condition of receiving benefits. Id. at 313-14, 91 S.Ct. at 384. A recipient challenged the statute on the ground that it violated her Fourth Amendment right to be free of unreasonable searches. Id. The United States Supreme Court rejected the challenge for two reasons. Id. at 317-24, 91 S.Ct. at 386-89. The Court's primary reason for rejecting the Fourth Amendment challenge was that the home visit was not a search. Id. at 317-18, 91 S.Ct. at 386. The Court explained that the protection of the Fourth Amendment
is not a factor in this case, for the seemingly obvious and simple reason that we are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term. It is true that the governing statute and regulations appear to make mandatory the initial home visit and the subsequent periodic "contacts" (which may include home visits) for the inception and continuance of aid. It is also true that the caseworker's posture in the home visit is perhaps, in a sense, both rehabilitative and investigative. But this latter aspect, we think, is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context. We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.
Id. (emphasis added).
Verhein did not cite Wyman in her opening brief. The commissioner relied heavily on Wyman in her responsive brief. In reply, Verhein contends that Wyman is inapplicable because it does not concern drug tests. She urges us to apply "the well-developed line of Supreme Court case law dealing directly with the constitutional implications of random drug testing." She presumably refers to Skinner v. Railway Labor Executives' Ass'n , 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and Chandler v. Miller , 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), which she cited in her opening brief.
Verhein is correct in suggesting that there are differences between home visits and random drug tests and that, for that reason, Wyman is not identical to this case. But the challenged procedure in Wyman was a condition imposed on the receipt of welfare benefits, which is true in this case as well. And the primary purpose of the home visit in Wyman -to "determin[e] if there are any changes in [the recipient's] situation that might affect her eligibility to continue to receive Public Assistance," Wyman , 400 U.S. at 314, 91 S.Ct. at 384 -is similar to the purpose of *115 random drug testing in this case. Accordingly, Wyman applies to this case and controls the analysis, except to the extent that the nature of home visits differs from the nature of random drug tests.
Verhein also is correct in suggesting that the legal analysis in Wyman is different from the legal analysis in Skinner and other special-needs cases that were issued after Wyman . See, e.g. , Chandler , 520 U.S. 305, 117 S.Ct. 1295 ; Vernonia Sch. Dist. 47J , 515 U.S. 646, 115 S.Ct. 2386 ; Skinner , 489 U.S. 602, 109 S.Ct. 1402 ; National Treasury Employees Union v. Von Raab , 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). But to the extent that there are differences in the legal analysis, we are obligated to follow the Wyman opinion, not the subsequent opinions that coined the term "special needs" and developed that doctrine. The Supreme Court has warned lower federal courts and state courts not to disregard its opinions on the ground that "more recent cases have, by implication, overruled an earlier precedent." Agostini v. Felton , 521 U.S. 203, 207, 117 S.Ct. 1997, 2002, 138 L.Ed.2d 391 (1997). Rather, the Court has stated, "Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." Hohn v. United States , 524 U.S. 236, 252-53, 118 S.Ct. 1969, 1978, 141 L.Ed.2d 242 (1998). The Court has given clear instructions in this regard: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc. , 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989). The Supreme Court's prerogative to overrule its own decisions exists even if a subsequent opinion appears to have "significantly undermined" the rationale of its earlier holding. United States v. Hatter , 532 U.S. 557, 567, 121 S.Ct. 1782, 1790, 149 L.Ed.2d 820 (2001).
Accordingly, Wyman governs to the extent that it has direct application to this case. See Rodriguez de Quijas , 490 U.S. at 484, 109 S.Ct. at 1921-22. The Wyman Court reasoned that there was no Fourth Amendment search in part because the home visits were "not forced or compelled" and that "the beneficiary's denial of permission is not a criminal act." Wyman , 400 U.S. at 317, 91 S.Ct. at 386. The Court explained that a home visit would occur only if the recipient consented to it: "If consent to the visitation is withheld, no visitation takes place. ... There is no entry of the home and there is no search." Id. at 317-18, 91 S.Ct. at 386. That rationale is equally applicable in this case. Because there was no search in Wyman , there is no search, for purposes of the Fourth Amendment, in this case.[5]
*116 B.
The Wyman Court reasoned in the alternative that, if the home visit was a search for Fourth Amendment purposes, the search would not be unreasonable and, thus, not unconstitutional. Id. at 318-24, 91 S.Ct. at 386-89. The Court identified several factors leading to that conclusion, some of which are relevant to this case. For example, the Court reasoned that the welfare agency "is fulfilling a public trust" and that the state "has appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit from the aid it dispenses." Id. at 318-19, 91 S.Ct. at 386. The Court also reasoned that the public "naturally has an interest in and expects to know how ... charitable funds are utilized and put to work." Id. at 319, 91 S.Ct. at 386. The Court noted that "Mrs. James received written notice several days in advance" of the home visit and that "[t]he date was specified." Id. at 320-21, 91 S.Ct. at 387. The Court stated that there was no suggestion of an "unreasonable intrusion of her home," "no forcible entry," and "no impolite or reprehensible conduct of any kind." Id. at 321, 91 S.Ct. at 388. The Court noted that the home visit was conducted by a caseworker, not "by police or uniformed authority." Id. at 322, 91 S.Ct. at 388. The Court noted that the "home visit is not a criminal investigation, does not equate with a criminal investigation, and ... is not in aid of any criminal proceeding." Id. at 323, 91 S.Ct. at 389. The Court concluded by noting that "the situation is akin to that where an Internal Revenue Service agent, in making a routine civil audit of a taxpayer's income tax return, asks that the taxpayer produce for the agent's review some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax." Id. at 324, 91 S.Ct. at 389.
Because the alternative analysis in Wyman , which concerns a search that is a condition of welfare benefits, has direct application to this case, I would, in the alternative, follow Wyman 's alternative analysis by incorporating it into the contemporary special-needs analysis. See Rodriguez de Quijas , 490 U.S. at 484, 109 S.Ct. at 1921-22. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.' " Vernonia Sch. Dist. 47J , 515 U.S. at 652, 115 S.Ct. at 2390. Whether a particular search satisfies the reasonableness standard "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 652-53, 115 S.Ct. at 2390 (quotation omitted).
The commissioner generally relies on counties to administer supplemental aid. See Minn. Stat. §§ 256.01, subd. 2(a), 393.07 (2016). Washington County, the county to which Verhein applied for supplemental aid, has adopted written procedures *117 for implementing the random-drug-testing requirement in section 256D.024, subdivision 1(a). After determining that a person must be tested, the county selects a date for testing and sends written notice by mail at least five days in advance of the test. The county has contracted with a company that collects urine samples and conducts a "full laboratory screening." The appellate record does not include additional details of the testing procedures employed by the county or its contractor.
The Supreme Court has considered the intrusiveness of urine tests in special-needs cases. In Skinner and Von Raab , which were decided on the same day, the Court expressed concerns about the potential intrusiveness of urine tests but noted that the particular procedures employed in each case minimized the intrusiveness, and the Court concluded that the governmental interests outweighed the affected individuals' privacy interests. Skinner , 489 U.S. at 626-27, 633, 109 S.Ct. at 1418, 1421-22 ; Von Raab , 489 U.S. at 671-72, 677, 109 S.Ct. at 1393-94, 1396-97. In Vernonia School District 47J , the Court again expressed concerns about the potential intrusiveness of urine tests and emphasized that "the degree of intrusion depends upon the manner in which production of the urine sample is monit ored." 515 U.S. at 658, 115 S.Ct. at 2393. The Court concluded that "the invasion of privacy was not significant" in that case and that, on balance, the drug-testing policy was reasonable. 515 U.S. at 660, 115 S.Ct. at 2394.[6]
In "balancing" a urine test's "intrusion on ... Fourth Amendment interests against its promotion of legitimate governmental interests," id. at 652-53, 115 S.Ct. at 2390, I am mindful that, under state law, Minnesota statutes are presumed to be constitutional. See In re Welfare of M.L.M. , 813 N.W.2d 26, 29 (Minn. 2012) (considering whether statute violates Fourth Amendment). Our supreme court "exercise[s] the power to declare a law unconstitutional only when absolutely necessary in the particular case and then with great caution." Soohoo v. Johnson , 731 N.W.2d 815, 821 (Minn. 2007) (quotations omitted). Consequently, "The party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute violates a constitutional provision." M.L.M. , 813 N.W.2d at 29. In this particular case, Verhein has not attempted to demonstrate that the county's procedures for obtaining urine samples are insufficiently protective of her privacy interests, which is an important consideration in the balancing of intrusiveness and legitimate governmental interests. See Vernonia Sch. Dist. 47J , 515 U.S. at 658, 115 S.Ct. at 2393. Furthermore, the commissioner assures us that the urine-test results "are private data and cannot be shared with third parties, *118 even law enforcement, without consent, a court order, or express statutory authority." See Minn. Stat. § 13.46, subd. 2 (2016). Accordingly, it appears that the county's testing procedures are consistent with the testing procedures that passed muster with the Supreme Court in Skinner , Von Raab , and Vernonia .
Because the Supreme Court held in Wyman that the New York statute promoted legitimate governmental interests, and because the Supreme Court has held that warrantless urine tests are reasonable for various non-law-enforcement purposes, I would conclude that the random-drug-testing requirement in section 256D.024, subdivision 1(a), of the Minnesota Statutes is reasonable in the circumstances of this case.
C.
In both her opening brief and her reply brief, Verhein relies on Lebron v. Secretary of Florida Dept. of Children & Families , 772 F.3d 1352 (11th Cir. 2014), which appears to be the only precedential opinion of an appellate court concerning random drug testing as a condition of receiving welfare benefits. In that case, the United States Court of Appeals for the Eleventh Circuit considered a Fourth Amendment challenge to a Florida statute that required all recipients of certain welfare benefits to submit to random drug testing as a condition of receiving those benefits. Id. at 1355. The court concluded that the state did not establish a substantial need that would justify the random-drug-testing requirement. Id. at 1378. The court reached that conclusion by relying solely on the special-needs cases that were decided after Wyman . Id. at 1356-78. The court did not consider Wyman to be controlling and discussed it only briefly in a footnote near the end of its opinion. Id. at 1378 n.10. As explained above, however, Wyman must govern the analysis.
Even to the extent that the post- Wyman special-needs caselaw applies, Lebron is not persuasive. Lebron relies on the Supreme Court's opinion in Chandler , but Chandler is distinguishable. In Chandler , the Supreme Court invalidated a Georgia statute that required all persons seeking election to high state office "to certify that they have taken a drug test and that the test result was negative." 520 U.S. at 308, 117 S.Ct. at 1298. The state argued that the statute was justified because "the use of illegal drugs draws into question an official's judgment and integrity ... and undermines public confidence and trust in elected officials." Id. at 318, 117 S.Ct. at 1303. The Court reasoned that the state had not demonstrated that the problem of drug abuse among elected officials was "real and not simply hypothetical." Id. at 319, 117 S.Ct. at 1303. The Court also reasoned that the certification requirement was "not well designed to identify candidates who violated antidrug laws" or to "deter illegal drug users from seeking election" because, with 30 days' notice, a person could circumvent the requirement by abstaining from use before a test. Id. at 319, 117 S.Ct. at 1304. The Court further reasoned that the state law was merely "symbolic" and, thus, did not serve a special need. Id. at 322, 117 S.Ct. at 1305. In rejecting the state's argument, the Court did not say that the state's goals-integrity, public confidence, and public trust-were illegitimate. Thus, Chandler does not undermine Wyman 's reasoning that a state, in administering a welfare program, is "fulfilling a public trust" and "has appropriate and paramount interest and concern in" ensuring that public funds are spent effectively, and that the public "has an interest in how ... charitable funds are utilized and put to work." Wyman , at 318-19, 91 S.Ct. at 386.
*119 In any event, the weaknesses of the Georgia statute in Chandler and the Florida statute in Lebron are not present in this case. Minnesota's random-drug-testing requirement applies only to persons who have been convicted of a drug crime. Minn. Stat. § 256D.024, subd. 1(a). In contrast, the Florida statute required all welfare recipients to submit to random drug testing. Lebron , 772 F.3d at 1355. In addition, a urine test conducted by the county's contractor with only five days' notice is well designed to identify persons who are using controlled substances, unlike the certification requirement in Chandler . Furthermore, Verhein does not contend that section 256D.024, subdivision 1(a), is merely symbolic, and we have no reason to doubt that the statute is a genuine attempt to promote policies stated in the supplemental-aid statute, such as "maximiz[ing] the use of federal funds for public assistance purposes" and providing assistance to Minnesota residents "who are found to have maintenance needs." See Minn. Stat. § 256D.34 (2016).
Thus, I would conclude that the random-drug-testing requirement in section 256D.024, subdivision 1(a), does not violate Verhein's rights under the Fourth Amendment to the United States Constitution.
For all of the reasons stated above, I would affirm the judgment of the district court.

It is immaterial that the statute uses the plural form of the word "limitation" because "the singular includes the plural; and the plural, the singular." See Laase v. 2007 Chevrolet Tahoe , 776 N.W.2d 431, 435 (Minn. 2009) (quoting Minn. Stat. § 645.08(1), (2) (2008) ). This canon of construction applies even if a statute is unambiguous. See id. at 435-36.

Verhein cites article I, section 10, of the Minnesota Constitution but does not argue that it should be interpreted more broadly than the Fourth Amendment to the United States Constitution. Accordingly, it is unnecessary to engage in a separate analysis of state constitutional principles.

This part of the Wyman opinion appears to acknowledge that a welfare recipient may face a choice between consenting to a condition of eligibility and foregoing welfare benefits. See Wyman , 400 U.S. at 317-18, 91 S.Ct. at 386. That choice is the focus of the unconstitutional-conditions doctrine, which would ask whether a person was coerced into consenting to a waiver of constitutional rights or was deterred from asserting constitutional rights. See State v. Netland , 762 N.W.2d 202, 211-12 (Minn. 2009) (citing Richard A. Epstein, Unconstitutional Conditions, State Power, and the Limits of Consent , 102 Harv. L. Rev. 4, 6-7 (1988) ). The district court in this case rejected Verhein's Fourth Amendment argument solely on the ground that the Minnesota courts have not recognized the unconstitutional-conditions doctrine in conjunction with Fourth Amendment rights. See Netland , 762 N.W.2d at 211-12 ; Stevens v. Commissioner of Pub. Safety , 850 N.W.2d 717, 724-25 (Minn. App. 2014) (citing Netland ). Both parties have made arguments to this court concerning the unconstitutional-conditions doctrine. But the supreme court's caselaw suggests that it is unnecessary to apply the unconstitutional-conditions doctrine if the Fourth Amendment caselaw is sufficient to resolve a challenger's claim. See State v. Thompson , 886 N.W.2d 224, 234 n.9 (Minn. 2016). In this case, it appears that the Wyman opinion supplies a rule of law that accounts for the concepts of choice, consent, and coercion, which are the concerns of the unconstitutional-conditions doctrine. Cf. Celia Goetzl, Comment, Government Mandated Drug Testing for Welfare Recipients: Special Need or Unconstitutional Condition? , 15 U. Pa. J. Const. L. 1539, 1549-59 (2013). Because Wyman is a sufficient basis for rejecting Verhein's Fourth Amendment argument, it is unnecessary to consider the unconstitutional-conditions doctrine. See Thompson , 886 N.W.2d at 234 n.9.

Our supreme court recently considered the reasonableness of urine tests in a different context: a search incident to an arrest for driving while impaired. See Thompson , 886 N.W.2d at 227-30. The supreme court noted that a urine test might allow law enforcement "to extract information beyond a simple [alcohol concentration] reading," id. at 231 (alteration in original) (quoting Birchfield , 136 S.Ct. at 2178 ), and that "urine testing implicates weighty privacy concerns" because it requires a person to "perform[ ] a personal and private bodily function 'in full view' before law enforcement," id. at 232. The supreme court concluded that, given the purpose of determining a driver's alcohol concentration, urine tests "cannot be justified ... given the availability of less-invasive breath tests that may be performed incident to a valid arrest." Id. at 233. In this case, no party has suggested that there is an alternative means of determining whether a supplemental-aid recipient uses controlled substances. Thus, although Thompson is useful in assessing the intrusiveness of urine tests, it has limited application to the balancing of that intrusiveness against the special need asserted by the commissioner.